IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FREDERICK E. BOUCHAT                *

        Plaintiff               *

          vs.                   *    CIVIL ACTION NO. MJG-11-2878

NFL PROPERTIES LLC, et al.          *

        Defendants              *

*        *        *        *        *        *        *        *        *

FREDERICK E. BOUCHAT                *

        Plaintiff               *

          vs.                   *    CIVIL ACTION NO. MJG-12-1495

NFL ENTERPRISES LLC, et al.         *

        Defendants              *

*        *        *        *        *        *        *        *        *

FREDERICK E. BOUCHAT                *

        Plaintiff               *

          vs.                   *    CIVIL ACTION NO. MJG-12-1905

BALTIMORE RAVENS LIMITED            *
PARTNERSHIP
                     *

        Defendant
*        *        *        *        *        *        *        *        *

## DECISION RE: FAIR USE ISSUES

The Court has before it motions for summary judgment[1] based upon a fair use defense in each of the three above-captioned cases.

In each case, the Defendants contended, and the Court agreed, that very limited discovery was necessary prior to the presentation of motions for summary judgment on the basis of a fair use defense.  Accordingly, following limited discovery, the instant motions were filed.[2]

The Court has considered the materials submitted by the parties relating to the motions as well as the arguments of counsel presented at a hearing.  The Court issues this decision determining the validity vel non of the fair use defense in regard to each of the three pending motions.


I.   BACKGROUND

As detailed in no less than seven (so far) published decisions of this Court and the United States Court of Appeals for the Fourth Circuit,[3] in late 1995, Plaintiff, Frederick E.

---

[1] Defendants' Motion for Summary Judgment [Document 26 in MJG-11-2878], Defendants' Motion for Summary Judgment on Fair Use [Document 20 in MJG-12-1495] and Defendants' Motion for Summary Judgment on Fair Use [Document 11 in MJG-12-1905]

[2] There is no contention that further discovery is needed to oppose the summary judgment motions.

[3] Bouchat v. Baltimore Ravens, Inc., 241 F.3d 350 (4th Cir. 2001); Bouchat v. Baltimore Ravens, Inc., 215 F. Supp. 2d 611 (D. Md. 2002); Bouchat v. Baltimore Ravens, Inc., 346 F.3d 514

Bouchat ("Bouchat") created a drawing referred to as the "Shield Drawing" and obtained copyright rights therein.



    The National Football League ("NFL") and the Baltimore Ravens[4] infringed Bouchat's copyright by copying the Shield Drawing and creating what is referred to as the "Flying B Logo."



    The Ravens used the Flying B Logo as the teams' primary logo during the first three (1996, 1997, and 1998) seasons.

_____

(4th Cir. 2003); <u>Bouchat v. Champion Products, Inc.</u>, 327 F. Supp. 2d 537 (D. Md. 2003); <u>Bouchat v. The Bon-Ton Dept. Stores, Inc.</u>, 506 F.3d 315 (4th Cir. 2007); <u>Bouchat v. Baltimore Ravens Ltd. P'ship</u>, 587 F. Supp. 2d 686 (D. Md. 2008); <u>Bouchat v. Baltimore Ravens Ltd. P'ship</u>, 619 F.3d 301 (4th Cir. 2010).
[4] In view of the numerous entities involved in the litigation, the Court's references to the "NFL" and "Ravens" are intended, collectively, to refer to all pertinent entities affiliated with the league and the team respectively.

Bouchat sued the NFL and Ravens and established infringement of his copyright in the Shield Drawing by their use of the Flying B Logo.  Bouchat, however, recovered no damages due to a jury finding that no part of the profits of the infringers, relating to the infringements then at issue, was attributable to the copyright infringement.  Judgment awarding no damages was affirmed by the United States Court of Appeals for the Fourth Circuit.[5]

In 2008, Bouchat sued the Ravens and the NFL, seeking injunctive relief to halt the then ongoing use of the Flying B Logo in three manners:

1.   The sale of season highlight films showing the 1996-98 Ravens on which the Flying B Logo was visible,

2.   The display at football games of film clips of Ravens' teams from 1996-98 on which the Flying B Logo was visible, and

3.   The display at the Ravens team headquarters of photographs of players and memorabilia (such as a first game ticket) on which the Flying B Logo was visible.

This Court, deciding the case on an agreed submitted record, held that there was no infringement because each of these uses was a non-infringing fair use under 17 U.S.C. § 107. Bouchat v. Baltimore Ravens Ltd. P'ship, 587 F. Supp. 2d 686 (D.

---

[5] Bouchat v. Baltimore Ravens, Inc., 346 F.3d 514 (4th Cir. 2003).

Md. 2008).  On appeal, the United States Court of Appeals for the Fourth Circuit reversed in part, agreeing that the aforesaid display was a fair use, but holding that the sale of highlight films and display of film clips at football games was not. Bouchat v. Baltimore Ravens Ltd. P'ship ("Bouchat 2010"), 619 F.3d 301 (4th Cir. 2010).  Thus, in Bouchat 2010, the case was remanded with directions to this Court to proceed to determine whether to grant injunctive relief.[6]

In the three above-captioned cases, Bouchat has sued for infringement of his copyright in the Shield Drawing due to the respective Defendants' use of the Flying B Logo as follows:

| Use At Issue | Defendant(s) | Case |
| --- | --- | --- |
| Documentary videos | NFL | 12-1495 ("the Documentary Video Case") |
| Pictures on stadium walls | Ravens | 12-1905 ("the Stadium Wall Pictures Case") |
| Madden NFL game | NFL & EA[7] | 11-2878 ("the Madden NFL Game Case") |

The fair use determination in each case is based upon the same legal principles and the benefit of the decision of the United States Court of Appeals for the Fourth Circuit in Bouchat 2010.

---

[6] The proceedings on remand remain pending at this writing.
[7] Electronic Arts Inc. ("EA").

II.   <u>SUMMARY JUDGMENT STANDARD</u>

A motion for summary judgment shall be granted if the pleadings and supporting documents "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).

The well-established principles pertinent to summary judgment motions can be distilled to a simple statement:  The Court may look at the evidence presented in regard to a motion for summary judgment through the non-movant's rose-colored glasses, but must view it realistically.  After so doing, the essential question is whether a reasonable fact finder could return a verdict for the non-movant or whether the movant would, at trial, be entitled to judgment as a matter of law.  <u>See, e.g.</u>, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Shealy v. Winston</u>, 929 F.2d 1009, 1012 (4th Cir. 1991).

The Court does not find that genuine issues of material fact[8] would prevent a grant of summary judgment in regard to the instant motions.

---

[8] <u>I.e.</u>, potentially outcome determinative fact issues.

III. <u>FAIR USE PRINCIPLES</u>

A copyright owner's ability to obtain relief for an unauthorized use of a copyright work is subject to a statutory exception for "fair use" provided in 17 U.S.C. § 107. <u>Bouchat 2010</u>, 619 F.3d at 307.

Courts have traditionally regarded fair use of a copyrighted work as "a privilege in others than the owner of the copyright to use the copyrighted material in a reasonable manner without his consent." <u>Harper & Row, Publishers, Inc. v. Nation Enters.</u>, 471 U.S. 539, 549 (1985)(quoting H. Ball, <u>Law of Copyright and Literary Property</u> 260 (1944)).

A person who makes fair use of a copyrighted work is not an infringer even if such use is otherwise inconsistent with the exclusive rights of the copyright owner. <u>See</u> 17 U.S.C. § 107 (providing that "the fair use of a copyrighted work . . . is not an infringement of copyright").

The doctrine of fair use is an equitable one, and the "fair use inquiry is 'not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis.'" <u>Bouchat 2010</u>, 619 F.3d at 308 (quoting <u>Campbell v. Acuff-Rose Music, Inc.</u>, 510 U.S. 569, 577 (1994)). Congress has enumerated four nonexclusive factors for courts to consider when evaluating whether a particular use is a fair use:

(1)   the purpose and character of the use,
      including whether such use is of a
      commercial nature or is for nonprofit
      educational purposes;

(2)   the nature of the copyrighted work;

(3)   the amount and substantiality of the
      portion used in relation to the
      copyrighted work as a whole; and

(4)   the effect of the use upon the
      potential market for or value of the
      copyrighted work.

17 U.S.C. § 107.

The use of the Flying B Logo in each of the three cases at issue is measured in light of these factors, keeping in mind, as directed by the Fourth Circuit, that "the factors are not to be treated in isolation, but rather the results are to be weighed together, in light of the purposes of copyright." Bouchat 2010, 619 F.3d at 308 (quoting Campbell, 510 U.S. at 578 (internal quotation marks omitted)).

A.   Purpose and character of use

The first factor calls upon courts to consider "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107. Here, courts generally consider a set of subfactors, including the commercial or noncommercial character of the use, the degree to which the use is transformative, the

defendant's good or bad faith, and whether the purpose of the use falls within one of the categories of purposes mentioned in the preamble of section 107.

### 1.   Protected purposes

In assessing the character of the use, courts consider the specific examples set forth in section 107's preamble – criticism, comment, news reporting, teaching, scholarship, and research.  17 U.S.C. § 107.  Certainly, this is not intended to be an exhaustive list, nor even presumptively fair, but it does guide the court as being representative of uses that are protected.  Bouchat 2010, 619 F.3d at 308, 309.

### 2.   Commerciality

Although the commerciality of the defendant's use is merely one factor among others that a court may consider as part of its analysis of the purpose and character of the use, a commercial purpose "tends to weigh against a finding that the challenged use is a fair use."  Id. at 310-11; Campbell, 510 U.S. at 583-84.  "The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the [protected]

material without paying the customary price." Bouchat 2010, 619 F.3d at 311 (quoting Harper & Row, 471 U.S. at 562).

### 3.   Transformative use

In Campbell, the Supreme Court suggested that an important factor to consider in whether a use was fair was whether the second use was "transformative" – whether it "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message."  510 U.S. 569, 579.

"A transformative use is one that employs the copyrighted work in a different manner or for a different purpose from the original, thus transforming it." Bouchat 2010, 619 F.3d at 309-10 (quoting Vanderhye v. iParadigms, LLC, 562 F.3d 630, 638 (4th Cir. 2009)(internal quotation marks omitted)).  A use may be transformative in function or purpose even if the original work has not been altered.  Vanderhye, 563 F.3d at 639.  Certainly, for the analysis to have meaning, it cannot be viewed as a binary concept, but one of degree – to what extent is the new work transformative?  See Bouchat 2010, 619 F.3d at 308 ("we ask, in other words, whether and to what extent the new work is transformative").

4.    Propriety of conduct

"[T]he propriety of the defendants' conduct is relevant to the character of the use." Id. at 311 (quoting Harper & Row, 471 U.S. at 562 (internal quotation marks omitted)).  In a sense, this subfactor asks if the use is "fair," because "[f]air use presupposes good faith and fair dealing." See Harper & Row, 471 U.S. at 562.[9]  A defendant's good or bad faith is a consideration, but not necessarily a determinative one, impacting the overall weighing of fair use factors.  NXIVM Corp. v. Ross Inst., 364 F.3d 471, 478-79 (2d Cir. 2004).

B.    Nature of the copyrighted work

This factor "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." Campbell, 510 U.S. 569, 586.  The Fourth Circuit has agreed with this Court's finding that "the creative nature of Bouchat's work would tend to indicate that making a copy would not be fair use." Bouchat 2010, 619 F.3d at 311 (internal quotation omitted).

---

[9] Consider also the Supreme Court's variation of the "golden rule" of fair use:  "Take not from others to such an extent and in such a manner that you would be resentful if they so took from you." Harper & Row, 471 U.S. at 550 n.3.

C.   <u>Amount and substantiality</u>

To analyze this factor, courts consider "the amount and substantiality of the portion" copied by the defendant "in relation to the copyrighted work as a whole."  <u>Id.</u> at 311 (citing 17 U.S.C. § 107).  To state it simply, the more the defendant takes of the plaintiff's work, the less likely it is that the taking will qualify as fair use.

If an entire work is copied, as is the situation in each of the three cases at issue, this weighs against finding a fair use.  <u>Id.</u> at 311 (citing <u>Sundeman v. Seajay Soc., Inc.</u>, 142 F.3d 194, 205 (4th Cir. 1998)).  Copying the entire work does not, however, preclude a finding of fair use and must be considered in light of the other factors.  <u>Sundeman</u>, 142 F.3d at 205-206.


D.   <u>Effect on the Market</u>

The fourth factor requires courts to consider the effect of the use "upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107.  The <u>Harper & Row</u> Court considered this factor to be the most important one in the context of that case, in which the defendant preempted the plaintiff's market by publishing the infringing work before the plaintiff had the opportunity to publish and establish its market.  <u>See</u> 471 U.S. at 566.  The <u>Campbell</u> Court later stated,

however, that all factors are to be explored, and that the market effect factor, "no less than the other three, may be addressed only through a sensitive balancing of interests." 510 U.S. at 590 n.21. "Market harm is a matter of degree, and the importance of this factor will vary, not only with the amount of harm, but also with the relative strength of the showing on the other factors." Id.

A "purpose of copyright is to create incentives for creative effort," and "a use that has no demonstrable effect upon the market for, or the value of, the copyrighted work need not be prohibited in order to protect the author's incentive to create." Sony Corp. v. Universal City Studios, Inc., 464 U.S. 417, 450 (1984).[10] At the same time, "[t]he mere absence of measurable pecuniary damage does not require a finding of fair use." Marcus v. Rowley, 695 F.2d 1171, 1177 (9th Cir. 1983). Certainly, any use that interferes with a copyright owner's market would weigh heavily against fair use, but the absence of harm to the market does not necessarily justify the secondary use. See Pierre N. Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. 1105, 1136 (1990).

---

[10] Although the Campbell Court later rejected the Sony Court's presumption of market harm, the rationale of this statement still holds true.

13

IV.   <u>FAIR USE DETERMINATIONS</u>

 A. <u>Stadium Picture Displays</u>

  1. <u>The Displays</u>

The Ravens have displays at their home stadium, M & T Stadium ("the Stadium"), relating to Baltimore's sports history. Three of these displays ("the Stadium Picture Displays") include pictures on which the Flying B Logo is visible.

<u>The Timeline Displays</u>:  On the second level concourse, there are several large displays that highlight significant times in Baltimore's football history from the Nineteenth Century, through the Colt era, the Canadian Football League years, and the time of the Ravens.  The 1996 display, prominently framing the entrance to a Women's restroom, includes pictures of the first home-game ticket and program on which the Flying B Logo can be seen.



<u>The Highlight Reel</u>:  The "Highlight Reel" is a display of still photographs located in the Club Level area near locations at which food and drink is sold.



The photographs in the Highlight Reel are accompanied by text that provides factual information about significant events in the Ravens' history.  The Highlight Reel includes photographs on which the Flying B Logo is visible, <u>i.e.</u>,

> The Ravens inaugural uniforms.  June 5, 1996.  "The new Ravens' logo, colors and uniforms are unveiled in a fashion show at Harborplace."

Jonathan Ogden wearing a Ravens collared
shirt.  April 20, 1996.  "Ravens select UCLA
T Jonathan Ogden with their 1st-ever draft
choice (4th overall).  Miami LB Ray Lewis is
selected with the team's 2nd pick in the 1st
round (26th overall)."

Peter Boulware wearing the Ravens helmet.
April 19, 1997.  "The Ravens select Peter
Boulware with their 1st pick in the 1997
draft (4th overall).  Boulware went on to
win NFL Defensive Rookie of the Year honors
finishing with 11.5 QB sacks, the 4th-best
sack total by a rookie in NFL history."

The new Stadium at its debut (with an image
of the Flying B Logo in the end zone).
September 6, 1998.  "The Ravens open their
new NFL Stadium in downtown Baltimore before
a host of dignitaries, a packed house and
the Steelers."

Brian Billick next to a Ravens helmet.
January 19, 1999.  "Brian Billick becomes
the second head coach in Baltimore Ravens'
history when he accepts a six-year contract
from owner Art Modell."

Important Plays:  The Important Plays display, on the Club
Level, is a group of photographs accompanied by dates and text,
commemorating important plays in the Ravens' history, including
two on which the Flying B Logo is wholly or partly visible.



"Quarterback Vinny Testaverde scores the
First Touchdown in franchise history on a 9-
yard run during the Ravens' 19-14 Win
against Oakland on September 1, 1996."



"Wide Receiver Jermaine Lewis ties an NFL
Single-Game Record with two punt return
Touchdowns (89 yards and 66 yards), earning
Baltimore a 31-24 win over Seattle on
December 7, 1997."

2.    The Fair Use Analysis

With one exception, the facts relating to the fair use analysis of the Stadium Picture Displays are essentially the same as those presented by the headquarters lobby displays held to constitute fair use in Bouchat 2010.  The sole material difference is that the Stadium Picture Displays are in the Stadium, so the general public must purchase a ticket to obtain entry.

a.    Purpose and character of use

The Court finds the purpose and character of use factor to favor a finding of fair use.  There is no doubt that the purpose of the Stadium displays is, like the headquarters lobby displays, "consistent with the fair use of copyrighted material in a museum."[11]  Bouchat 2010, 619 F. 3d at 313.

i. Commerciality

It is true that a member of the public must buy a ticket to get into the area in which the Stadium Picture Displays are

---

[11] The Court must note the ironic happenstance that the NFL benefits from analogizing M & T Stadium to a museum.  No Baltimore football fan can forget the unappreciated suggestion made by NFL Commissioner Paul Tagliabue, when refusing to grant a franchise to Baltimore, that the city use the funds set aside for a stadium to build a museum.  Perhaps the NFL will now agree with the Baltimore fans who said, when the Ravens opened their stadium, "Mr. Tagliabue, this is our museum."

located.[12]   However, in context, the static picture displays are
not any meaningful part of the incentive for a patron to buy a
game ticket.  Nor can the static displays be considered a part
of the game experience as are the video clips shown on the
scoreboard during games.  The video clips are specially selected
for that specific game's entertainment; the photographic
displays are hanging for viewing during all games, and at all
times, including non-game events or arranged tours. Moreover,
there is no direct or immediate commercial advantage from the
displays.

On balance, there is some, albeit indirect, commercial use
that would factor against a fair use finding absent a
substantial transformative use.


### ii.  Transformative use

As stated in Bouchat 2010, "[t]he season tickets and the
player photos adorned with the Flying B logo are displayed to
represent the inaugural season and the team's first draft picks.
In this way, the logo is used 'not for its expressive content,
but rather for its ... factual content.'" 619 F.3d at 314
(quoting Bond v. Blum, 317 F.3d 385, 396 (4th Cir. 2003)).
"This use is comparable to the use of the concert posters in

---

[12] Indeed, entry to the Club Level is had only at a premium
price.

Bill Graham Archives, where the posters documented the fact of
past concerts, a transformatively different purpose from their
original use as advertisements for future concerts."   Id.
(citing Bill Graham Archives v. Dorling Kindersley Ltd., 448
F.3d 605, 609 (2d Cir. 2006)(internal citations omitted)).

### iii.  Propriety of conduct

It is true that the Ravens are an originator of the
putative infringement at issue.  However, there is nothing to
put into doubt the Ravens' good faith in believing that the uses
at issue were non-infringing fair uses.

### b.  Nature of the Work

There is no doubt that the nature of the copyrighted work
tends to weigh against a finding of fair use.  However, as
stated in Bouchat 2010, "the [nature of the work] factor may be
of limited usefulness where the creative work of art is being
used for a transformative purpose."  Id. at 315 (quoting from
Bill Graham Archives, 448 F.3d at 612).  In view of the
substantial transformative use, this factor does not weigh
against a fair use finding.

c.  <u>Amount and substantiality</u>

The entirety of the copyrighted work was used.  As stated in <u>Bouchat 2010</u>:

> The Ravens have no choice but to use the
> entire copyrighted work if they wish to
> display the inaugural season tickets and the
> photographs of their first ever draft picks in
> their original team dress. The tickets were
> originally printed with the entire logo, and
> the players dressed with the entire logo on
> their helmets. Therefore, in order to fulfill
> the legitimate transformative purpose of
> exhibiting the Ravens inaugural season tickets
> and the photos of the team's first ever draft
> picks, the entire work has to be displayed.

<u>Id.</u> at 315.

As did the court in <u>Bouchat 2010</u>, this Court finds that the use of the entire copyrighted work is neutralized by the transformative nature of the use.


d.  <u>Effect on the Market</u>

The use of the Flying B Logo in the Stadium Picture Displays is transformative and only minimally, if at all, commercial.  The Court does not find, as urged by the defense, that the absence of a market in which Bouchat himself could exploit the copyrighted work is a major factor in the context of the instant case.  However, the transformative nature of the use, and the minimal commercial aspect of the use, largely offset the negative aspects of this factor.

21

e.   <u>Resolution</u>

The first (purpose and character of the use) factor weighs heavily in favor of a finding of fair use, the second (nature of the copyrighted work) and fourth (effect on the market) factors weigh only slightly against a finding of fair use, and the third (amount and substantiality) is neutral.

Considering the § 107 factors together, the Court finds that the use of the Flying B logo in the Stadium Picture Displays is a non-infringing fair use.

B.   <u>Documentary Videos</u>

1.   <u>The Videos</u>

Bouchat sued the NFL[13] for infringement of his copyright in the Shield Drawing by virtue of the use of the Flying B Logo in segments of three documentary videos (collectively referred to as "the Documentaries"):

1.   Top Ten Series: Draft Classes Episode

2.   Top Ten Series: Draft Busts Episode; and

3.   Sound FX Series: Ray Lewis Episode.

---

[13] As noted above, the term "NFL" is used herein to refer, collectively, to all entities affiliated with the National Football League.

The Documentaries were produced by the NFL and made available to viewers on certain internet sites[14] and cable television networks.[15]

The Top Ten Series: The Top Ten Series is a series of documentaries, each of which presents ten segments related to NFL players, coaches, or events from NFL history, accompanied by archival footage and interviews.

The episode Top Ten: Draft Classes provides segments on the all-time ten best NFL draft classes, including a four-minute segment on the Ravens 1996 draft class.  Two fleeting images of the Flying B Logo can be seen during the introductory portion of the segment, and a third fleeting image appears in the last football scene of the segment.

The episode Top Ten: Draft Busts provides segments on the all-time worst NFL draft choices, including a four-minute segment on Lawrence Phillips, selected by the St. Louis Rams in 1996.  At the end of the segment, a play is seen in which a defensive player tackles Phillips.  A glimpse of the Flying B Logo possibly can be seen by one who is directed to look for it

---

[14] Including NFL.com and hulu.com, a website offering ad-supported streaming video of TV shows, movies, clips, and other film footage from various networks and studios.
[15] Including the NFL Network.

during the brief time (some fraction of a second) in which it is visible.

Sound FX: Sound FX is a documentary series airing on NFL Network.  Each episode offers viewers an inside look into the sights and sounds of football games and practices through players who are wearing microphones.  The Ray Lewis episode provides a compilation of audio and footage of Ray Lewis over the course of his career with the Baltimore Ravens.  In one segment, Ray Lewis is shown at training camp with his teammates playing a practice game, and the Flying B Logo can be seen on some of the players' helmets at various times over a period of about eight seconds.  There is also a fleeting partial image of the Flying B Logo on the side of Ray Lewis's helmet about a minute later in the film when he is making a tackle.


>        2.    The Fair Use Analysis

The pertinent facts relating to the fair use analysis of the Documentaries are materially different from those relevant to the film clips presented at home football games that were considered in Bouchat 2010.

a.   <u>Purpose and character of use</u>

The Court finds the purpose and character of use factor to favor a finding of fair use.  The Documentaries use pictures and film clips that show the Flying B Logo selectively as necessary to portray "history" in biographical and comparative presentations, distinct from the video presentation in the Stadium during a home game showing a few plays from a prior game against the same team.

i. <u>Commerciality</u>

There is no doubt that the Documentaries are produced for a commercial purpose and that the NFL earns income by making them available to viewers.  There is no need to quibble about the extent to which the income generated is direct or indirect.  As made clear in <u>Campbell</u>, a sufficiently transformative use – in that case a parody – can be a fair use even though it involves the obviously commercial and exploitive unauthorized use of a copyrighted work.  <u>See</u> 510 U.S. at 579, 584–85.

ii.   <u>Transformative use</u>

The Documentaries are substantially transformative uses. Each offers commentary, criticism, and documents historical facts.  Each use in these films adds something new by

25

representing factual content, documenting and commenting on historical events, or functioning as a biography or career retrospective. The Flying B Logo, to the extent seen in the Documentaries, is being used "not for its expressive content, but rather for its . . . factual content." Bouchat 2010, 619 F.3d at 314 (quoting Bond, 317 F.3d at 396).

### iii. Propriety of conduct

It is true that the NFL is an originator of the putative infringement at issue.  However, there is nothing to put into doubt the NFL's good faith in believing that the uses of the Flying B Logo in Documentaries were non-infringing fair uses.

### b.   Nature of the Work

There is no doubt that the nature of the copyrighted work tends to weigh against a finding of fair use.  However, as stated in Bouchat 2010, "the [nature of the work] factor may be of limited usefulness where the creative work of art is being used for a transformative purpose." Id. at 315 (quoting from Bill Graham Archives, 448 F.3d at 612).  In view of the substantial transformative use, this factor does not weigh against a fair use finding.

c.   Amount and substantiality

The entirety of the copyrighted work was used. However, as with the uses in the Stadium Picture Displays, the Court finds that the use of the entire copyrighted work is neutralized by the transformative nature of the use.

d.   Effect on the Market

The use of the Flying B Logo in the Documentaries is transformative and only minimally commercial.  The Court does not find, as urged by the defense, that the absence of a market in which Bouchat himself could exploit the copyrighted work is a major factor in the context of the instant case.  However, the substantial transformative nature of the use offsets the negative aspects of this factor.

e.   Resolution

The first (purpose and character of the use) factor weighs heavily in favor of a finding of fair use.  The negative aspects of the second (nature of the copyrighted work) and fourth (effect on the market) factors are effectively outweighed by the substantially transformative nature of the use, and the third (amount and substantiality) factor is neutral.

Considering the § 107 factors together, the Court finds that the use of the Flying B logo in the Documentaries is a non-infringing fair use.

C.    The Madden NFL Game

1.    The Game

For some 20 years or more, Defendant Electronic Arts Inc. ("EA") has produced a video football game, named Madden NFL, and referred to herein as "the Game." At all times relevant hereto, EA published current editions of the Game annually on various game station platforms.[16]

The Game essentially allows game players to experience the excitement and challenge of NFL football in a virtual environment. Game players can choose to compete against an opponent controlled by the Game itself, against another player present and connected to the same game station, or against a remotely located player connected through the internet.

Game players may select their virtual teams from any of the 32 current NFL teams. Game players can use some 2000 virtual players that simulate (by appearance and performance characteristics) current NFL payers and/or can choose to create fictional players and add them to the team rosters. Hence, a

---

[16] And, sometimes, computer platforms.

Game player can replace a current player on a team with a fictional player having the game player's own name with selected "heroic" characteristics.  Game players can have the virtual games played in their choice of virtual setting (stadium, time of day, weather, etc.).

The Madden NFL '10, '11, and '12 versions of the game for Xbox 360 and PlayStation 3 and Madden NFL '12 for the Wii included a "throwback uniform" feature.  Using this feature, a Game player can choose to dress the players on a virtual team in uniforms that had been used by that team in the past.  Thus, the throwback uniform feature enables a game player choosing the Baltimore Ravens to have the Ravens wear the team's original (1996-98) uniforms that included the Flying B Logo.


2.  The Fair Use Analysis

The Court finds the use of the Flying B Logo in the Game to present a situation materially different from that presented in regard to the Stadium Picture Displays and the Documentaries.


a.  Purpose and character of use

The Court finds the purpose and character of use factor to favor, quite strongly, a finding that there was no fair use.

The Game does not, as do the Stadium Picture Displays and the Documentaries, use the Flying B Logo as necessary to present accurate depictions of historically significant artifacts (such as the first ticket and program) or events.  Rather, the Game uses the Flying B Logo optionally to augment sales of its product by seeking to profit from the "nostalgia value" gained from use of the infringing work in the very same manner as was the original use.

i. Commerciality

The Game is a commercial product, and the Flying B Logo is used for a commercial purpose.  EA can be presumed to have made a commercial decision that it could increase its sales by including the throwback uniform feature in the versions at issue.  A part of this feature was the inclusion of the Ravens' 1996-98 uniforms with the Flying B Logo.

There certainly can be a debate, and no doubt will be, as to the amount of commercial value of the throwback uniform feature and the portion of such value attributable to the use of the Flying B Logo.  Nevertheless, it is fair to conclude that the throwback uniform feature would not have been added to the Game without a determination by EA that there was commercial

value (even if a small one) to the addition of a feature that
included the use of the Flying B Logo.[17]

          ii.   <u>Transformative use</u>

     If there is a spectrum of transformative uses, the use in
the Game is at the low end, if in the spectrum at all.  The
least transformative use would appear to be a use in which the
Ravens decided – as have other NFL teams this very season – to
suit up for a league game wearing throwback uniforms.  Put
succinctly, the Game is making virtually the same use.[18]  The
Game presents a use that can be described as totally or
virtually non-transformative.

---

[17] It must be emphasized that the allocation of the value of the
use of the Flying B Logo in the throwback uniform feature is not
the same as the allocation of value to the sale of licensed
merchandise at issue in earlier lawsuits.  With regard to
merchandise (for example, caps, tee shirts, etc.), it may make
no difference whether the Flying B Logo or some other logo is
used to signify affiliation with the Ravens.  However, in the
Game throwback uniform feature, it is <u>the Flying B Logo and no
other</u> that adds the desired "nostalgia value."

[18] Although the world created in the game is fictional, the
Flying B Logo is still being used as an identifying symbol
within the virtual world created. A helmet with the Flying B
Logo readily identifies the virtual football player as playing
for the virtual Ravens team. As the Fourth Circuit concluded,
"[a] logo is an identifying symbol . . . ." and "the logo
remains a symbol identifying the Ravens." <u>Bouchat 2010</u>, 619
F.3d at 309.

### iii.  Propriety of conduct

There is a question whether the unauthorized use of the Flying B Logo in the Game will be found to have been done in good faith.[19]  As of this writing, there is a question whether the versions of the Game using the Flying B Logo were produced by EA pursuant to a license from the NFL that included the Flying B Logo.[20]

If there was a license, EA may be viewed as having reasonably relied upon the license.  However, the NFL had no right whatsoever to grant such a license to use Bouchat's copyrighted work.  Hence, certainly by the time Madden NFL '10 was produced, NFL knew, or manifestly should have known that it could not purport to grant such a license.

If there was no license, there may be no claim against the NFL, but there would be a serious question as to EA's good faith.

The bottom line is that, from the point of view of the defense, the propriety of conduct factor is of no help to them.

---

[19] The issue is not now being resolved but will be addressed, as necessary, in other contexts.

[20] For purposes of the instant motion, EA concedes it was not licensed but contends that its use constitutes fair use and that its designers incorporated the Flying B Logo into Madden NFL in good-faith belief that it was appropriate and within their rights.

b.   Nature of the Work

There is no doubt that the nature of the copyrighted work
tends to weigh against a finding of fair use.


c.   Amount and substantiality

The entirety of the copyrighted work was used.  Unlike the
uses in the Stadium Picture Displays, and the Documentaries, the
use of the entire copyrighted work in the Game is not
neutralized by the transformative nature of the use.


d.   Effect on the Market

The use of the Flying B Logo in the Game is substantially
commercial and barely, if at all, transformative.

The Court does not find, as urged by the defense, that the
absence of a market in which Bouchat himself could exploit the
copyrighted work is a major factor in the context of the instant
case.

The NFL recognizes that there is a market to exploit the
nostalgia value of throwback uniforms, choosing to have modern
teams - as recently as the very day before this writing – play
official games in throwback uniforms such as the Pittsburg
Steelers' "Bumble Bee" regalia shown here:



Moreover, at least some NFL teams currently offer for sale replicas of throwback uniforms, and the NFL sells on its website a number of consumer products that are decorated with historic logos from various NFL teams.  Since there is a market for memorabilia, it only stands to reason that there is a potential market for the Flying B Logo.[21]  See Bouchat 2010, 619 F.3d at 313 ("we conclude that there is a potential market for Bouchat's copyrighted work").

It must be borne in mind that Bouchat's copyrighted work is the Shield Drawing, not the Flying B Logo, a work derived from Bouchat's.  It is notable that throughout the course of the Bouchat litigation, all concerned – including all judges – appear to recognize that the absence of any market for a license of Bouchat's copyrighted work, the Shield Drawing, does not make the Flying B Logo a fair use.

---

[21] After all, it was the logo on the Ravens' inaugural uniform.

The instant litigation arises in a context in which a user of the Flying B Logo needs consent of both Bouchat and the NFL. There is, no doubt, a market for the Flying B Logo.  Hence, it would be unsound to find that there is no market for Bouchat's copyrighted work since that work is, itself, an integral element of the Flying B Logo.  Indeed, Bouchat is analogous to the holder of a patent on an item that is of commercial value only if it incorporates the invention of an improvement patent. There would be no market for the product produced by virtue of the initial patent, but the improvement patent enables a marketable product.

The Court finds that Bouchat's inability, on his own, to license his copyrighted work, the Shield Drawing, is not a factor in favor of permitting fair use.

e.   <u>Resolution</u>

The first (purpose and character of the use), second (nature of the copyrighted work), and third (amount and substantiality) factors weigh heavily against a finding of fair use.  The fourth (effect on the market) factor is, if not neutral, only slightly favoring a finding of fair use.

Considering the § 107 factors together, the Court finds that the use of the Flying B logo in the Game is not a fair use.

V.      <u>CONCLUSION</u>

For the foregoing reasons the Court finds that:

1.      The uses of Bouchat's copyrighted work in the Stadium Picture Displays at issue were non-infringing fair uses.

2.      The uses of Bouchat's copyrighted work in the Documentaries at issue were non-infringing fair uses.

3.      The uses of Bouchat's copyrighted work in the versions of <u>Madden NFL</u> at issue were not fair uses.

SO ORDERED, on <u>Monday, November 19, 2012</u>.

/s/_____

Marvin J. Garbis
United States District Judge